Good morning, Your Honors. Clay Bruce for Bullion Monarch Mining, on the Barrick matter. The most fundamental error, I think, in the Court's case on the rule against perpetuities issue was a factual finding that there are two royalties in the 1979 agreement. There is only one. Before you jump to that, could I just ask a foundational question? And that has to do with the fact that the rule against perpetuities, which we all learned in law school but have had little opportunity to apply, and which Nevada, at least after its amendment, doesn't have particularly robust law, should that issue be certified to the Nevada Supreme Court? Perhaps, Your Honor. Frankly, I've never thought of that. I mean, it is a fundamentally state law issue, so. Well, and I think another. So you don't object? I don't object. All right. And I think another. Well, you can go ahead and proceed with your two factual points. I just wanted to lay that out as a question. I think to maybe even put a little finer point on that is we have, since 1849, when gold was discovered about 90 miles from here, and the West ever since then has been heavily involved in mining. It's been a major industry in Nevada and California and the other states that are covered by the Ninth Circuit. During all of that time, all of the thousands, if not hundreds of thousands, of mining agreements, many, if not most of which, have royalty provisions with area of interest provisions in them. Not one Ninth Circuit case addressing royalty area of interest provisions. Well, that's understandable because it's understandable because they're state law questions and we often don't publish on state law questions. I mean, it is sort of remarkable, I'll grant you that. Actually, the whole — it's remarkable that it doesn't come up more often in state courts because as you — I did practice in that area and I can — you're And I think the reason for that is they don't belong in this setting. If you go back to a more fundamental question of what was the rule against perpetuities for, it was to originally prevent Grandpa from giving something to his fourth grandson or great-great-great-grandson down the road and give everybody life estates in between to tie up that property. In this particular instance, there's not that concern that the properties in the area of interest will be tied up that way. No, I'll grant you that. But I think as a mining lawyer, you'd have to say that you draft against it all the time, don't you? Out of precaution? Well, when it's drafted against, usually what we're talking about are the options that are involved or actual pieces of property that are vested. And that gets to the two Because there is only one royalty. It's paragraph four. What paragraph 11 does is bring different properties under the umbrella of that royalty. So if the rule against perpetuities defense is valid, the royalties under paragraph four are invalid too? It does not — no. I didn't think you wanted to go there. Well, their position is there's one vesting and after acquired property falls into it. Their position is there's no vesting until later on the after acquired property. Exactly. I mean, that's where we are. And the judge already found — the judge in the lower court already found that the paragraph four royalty has vested. And so what happens is that paragraph four royalty vests — I don't know that he found that. I think he said it's vested as to the subject properties. That's not — this was different from saying the paragraph four royalties, because paragraph 11 refers to royalties, but it says nothing other than subject royalties for bullion. And the only way you can find out what bullion might be owed in terms of royalties is to go back to paragraph four. But we have two different groups of properties. We've got subject properties and we've got area of interest properties. And I don't think you can say that paragraph four covers all the royalty obligations. There's royalty obligations coming under paragraph 11 for after acquired properties. But the only royalty obligations are in paragraph four. Well, that sets out the rates. That sets out the properties that it applies to, but it sets them out in a way that is different than the way they're set out for the Leeville property. Our position is that the owner of the Leeville mine becomes subject — well, if the owner of the Leeville mine acquires properties in the area of interest, then the owner of the Leeville mine owes that royalty. There's nothing in the 1979 agreement that says a new royalty attaches to those properties so that if somebody comes along down the road and buys those properties, it's as a matter of record. And the way that the recording works and the way that the properties are acquired bears this out. And I'll try to explain that. There is a recording of the 1979 agreement almost immediately after the 1979 agreement is executed. And there's also attached to that the Schedule A-1 properties. So anybody who goes in and buys the Leeville mine, wants to look it up on the record, sees there that those properties are burdened by the 1979 agreement. If somebody goes into properties in the area of interest, that same type of recording is not required by the 1979 interest. And the reason is important. The reason is that the Leeville mine, it doesn't come from anybody who acquires property in the area of interest or even a subsequent purchaser from the Leeville mine. If, for example, Barrick acquires one of those little boxes outside of the Leeville mine while it owns the Leeville mine, Barrick wants to sell that little claim to somebody else, the person who buys it doesn't automatically owe the royalty. Barrick owes the royalty because part of the price of taking title of the Leeville mine, which there was significant benefit for, part of that price is paying my client a royalty on anything that is found or developed in the area of interest. And that's significant, because the contract also says, after May 10, 1979, only the owner of the  Leeville mine can acquire property in the area of interest among the parties who are parties to the 1979 agreement. And that also is significant. Don Morris is in the courtroom today. He was a boy with his dad out there staking the claims that are the Leeville mine, walking those hills. The reason that's significant is, after they signed the 1979 agreement, both of them signed the 1979 agreement. Bullion had to walk away from that area of interest. And they were not allowed to acquire any property in there anymore. So there's a great benefit to not only owning the Leeville mine, which has generated hundreds of millions, if not billions of dollars, but there's also a great benefit to having people who are very familiar with that property decide to walk away and say, we're not going to acquire any more property here. You're not allowed to acquire any more property here. And so with that comes the burden that if you're going to take the Leeville mine and have the so-called exclusive right to go out and acquire property in that area, you have to pay Bullion the tithing for having Bullion walk away and give you that very valuable property in the first place. So that's why we say there is not a second vesting, because if somebody from who is not the owner of the Leeville mine, anybody else can go acquire property. But if you have the Leeville mine that Bullion gave to you, you have the obligation, if you're able to find additional properties afterwards, to pay Bullion. Number one, for the great consideration that Bullion has given you in the Leeville mine. Number two, for having Bullion walk away from that area. I understand that perfectly in terms of sort of honoring the purpose and the purpose of the law. I mean, I don't think there's a very good argument as to why the rule against perpetuities should not apply at all. It may be an argument as to why we might want to hear from the Nevada Supreme Court. Because it's significant. I mean, there are a lot of, you know, practical and policy things that work into a rule like a rule against perpetuities that the state legislature considers. And that's why it did occur to me that... But there are a lot of federal leases, too. There are federal leases, although, you know, again, many of them might end up being, you know, there may be cases like this with the Nevada state law. So, you know, we may have to decide it, but then we would have to decide it based on, you know, as written and as based on how we interpret the existing Nevada law or what little there is. Yeah. There is little. There is little. Jumping to another issue is an equitable estoppel issue. And that is that when Barrick came into the Leeville property, originally it was high desert. Barrick bought high desert. So Barrick and high desert, they've admitted they stand in the shoes of high desert. They've admitted they stand in the shoes of the 1979 agreement and all of its burdens, responsibilities. And so the equitable estoppel cases that we cited say a defendant cannot come into the court after having already accepted all of the burdens of a contract and then turn around and say, by the way, I'm not paying the consideration because the rule against perpetuities. Yeah, but that begs the question, what are the obligations under the contract that have been assumed? And if the contract is void ab initio as to that part, I mean, I didn't assume it. Well, but then it seems fair to me anyway that if the contract that Bullion signed is void from the beginning, you've got to void the whole thing. Because a royalty interest in the area of interest properties is a significant portion of the consideration. But that's where you started out but didn't really want to go when I suggested that, well, if the area of interest is void under the rule against perpetuities, and you're arguing that the royalty agreement covers everything, why doesn't that void everything? And if that does, what about the royalties that are being paid to Bullion as to the subject properties? You don't really want that result. I would bet that my client would stand up and say, we'll take the Leeville property back and all the gold that Newmont and Bullion have taken out of it, and we'll happily give them 1 percent. That's your idea as to what happens if the contract's void. Oh, okay. All right. Refresh me. Does the 79 agreement have a severability clause? No. Okay. It does not. I'd like to reserve the remainder of my time for rebuttal. Okay. If I can I talk about the case, the latches issue? No. Oh. No? We can't go back where we can only go forward. It's easy to get the other counsel up here. Yeah. May it please the Court, Francis Wickstrom arguing on behalf of Berrick. I'd first like to address Judge McKeon's question about whether this issue ought to be certified to the Nevada State Supreme Court. I would suggest that you don't need to certify it, because this is not a – there's nothing peculiar about Nevada other than the fact that they have enshrined the common law in their Constitution. So this really is a question of common law. And if they've enshrined the common law in their Constitution, what that tells me is the Nevada Supreme Court can do pretty much whatever it wants to do with respect to State law as a matter of judgment. Right. But interpreting the common law, this Court, I would submit, is as capable of doing that as the Court of Nevada, because what the Nevada Supreme Court will do is look to the broad interpretations of the common law that have come down over the past several hundred years on the road against perpetuities. Yeah. Indiana? Is it going to look to Missouri? I mean, we've got two different rules coming out of those two different states. Well, I would suggest that they should look to both of them, because if you look at the – And then what? Because you've got two different rules. And that's a fairly easy question. Well, the worst case scenario for us is that we issue a decision, and then the Nevada Supreme Court, five years from now, comes up with a contrary interpretation of State law. And that's the risk that everyone has in this. I think what the Nevada Supreme Court would do, Your Honor, is what this Court would do, would look to the Missouri case in Commerce Bank, and would look to the Indiana case, and would decide that the Missouri Court of Appeals got it wrong, totally got it wrong, in the Commerce Bank case. First of all, what they did – Oh, okay. Commerce Bank has been cited as – well, I know it's been debated, but, boy, that The dean of the Stanford Law School, I think, rather approved of the Commerce Bank case, Charles Myers. Now, he wrote his piece long before he was the dean of the Stanford Law School, but there's respectable opinion on that side of the question. If you read Commerce Bank carefully, you'll see that they relied on dicta in the Denny v. Teal case. Right. And the Denny v. Teal was an interesting case, because there the Oklahoma Supreme Court was applying Kentucky law. And what they said was they applied the Kentucky wait-and-see statute, which applied to this particular thing. So in that sense, Denny v. Teal actually stands for our position, because what the Oklahoma Supreme Court said is, they don't vest. We'll wait and see. If they vest within the wait-and-see period, they're good. And so Denny v. Teal supports our position that the interest in property to be acquired possibly in the area of interest will not vest until the property is actually acquired. You know, the problem I have globally with this, I mean, just so you know, is that there are so many area of interest agreements out there in the West that, although in front of us seems to be, you know, a lot of money, but a peculiar small problem, but this is thousands and thousands of agreements, and billions and billions of dollars are affected by whether we say these agreements are void, have an issue. I mean, that's a pretty big step to take to say, to rule up against a common law rule that's going to void all these agreements from the beginning. Your Honor, my learned friend has raised the specter of chaos in the mining industry, if you were to so rule. And they've also argued that there is nothing in the, published by the Rocky Law, Mineral Law Foundation, et cetera, about that. I remember. I mean, I remember. And Your Honor probably knows that in their model agreements and in their publication, they all say, watch out for the rule against perpetuity. Oh, he's tried to draft it. And so, and lawyers draft around them all the time. And so the only area of interest clauses that are at risk are clauses like this that go on for 99 years or more. Well, let me ask you this. I mean, I know the analogies are imperfect, but generally speaking, and I know there are some exceptions, generally speaking, the rule against perpetuity would not affect a pooling agreement in oil and gas law. You'd agree with that? Pooling agreements are unaffected. I think that's correct, Your Honor, because there's nothing wrong with a perpetual royalty. Right. But these are agreements to join other, in other words, to commingle lease interests later on in perpetuity. I guess analytically, what's the difference here? Because I believe pooling agreements involve agreements to pool property that people have a present interest in. And so if you grant a royalty in a piece of property that you own or you have an interest in or you reserve a royalty in a piece of property that you have an interest in, then that royalty vests immediately. And the law is clear that the enjoyment of that royalty can extend in perpetuity. And the Texas Law Review article that they cite in their brief is that's what that deals with. That's not a rule against perpetuity. Well, no. Often pooling agreements deal with future events and are not specific as to the pooling that would occur if you pooled the property immediately. They'll say in the future, if there is this, then we will pool. I realize that mineral law and oil and gas law are different, but I'm struggling with the analytical difference in this context. It's hard for me to respond to that, Your Honor, because first of all, I don't do oil and gas, and I'm not sure exactly what the terms of that agreement would be. But I believe that they could be drafted so that they're protected against the rule against perpetuity. Now, this may be of the same nature as Judge Thomas's question. I'm going to ask you about Article 9, floating liens. Why are they valid as against a rule against perpetuity challenge? Because a floating lien against accounts receivable is as to accounts that haven't come in yet. So what am I supposed to do with that on your theory of the rule against perpetuities? Or after acquired property. I mean, that is what that is. I mean, the accounts receivable are after acquired property. And it's a floating lien. It applies to all accounts receivable. In those cases, Your Honor, you're just replacing the original secured property with something else. I understand. So it allows the inventory to be sold. And so they're But I don't understand on your theory of the rule against perpetuities how the after acquired property is exempt from the rule. Because the that allows the property to be to be sold and replaced with something else. But but you're you're simply replacing property that people had exist originally. And I don't think it impacts at all our interpretation of the rule as it applies in this case. Okay. It wasn't a big argument, but it's one that is I think it's mentioned in that Wedel case and was mentioned here. And that is, well, it's not really property we're dealing with, but we're dealing with contract. What what we have is we have a contract, a contract agreement to to convey a real property interest in the future. I know when I learned the right. But there is some suggestion, at least in the case that you would you would analyze and maybe a real property right conveyed, but that the royalty aspect of it is a contractual right not tied to the property. Now, I know that goes generally contrary to Western property law, but it is an argument that they raised in passing and that is raised in the cases. It's a mineral interest, Your Honor, cannot be considered as any as something apart from a piece of property because basically it's it's measured by it applies to a particular piece of property. It's measured by what you produce from that property. And to have some sort of inchoate royalty interest floating out in the air, I think, is incongruous with our concept of property. We all accept it. Yes. I'll be there for a second just to clarify. I mean, when you use the term mineral mineral interest, are you using it loosely or are you talking about a mineral interest versus a royalty interest? A mineral is with with the property royalty, production royalty. That's right. The mineral estate. We all learned about the bundle of sticks in property law. The fee interest in the mineral estate is a bundle of sticks. A royalty is just one of those sticks. And whoever owns the mineral. Why is it a stick in there? I mean, the property is certainly in the mineral right. The ownership of minerals or the right to the minerals underlying the property, that's certainly a property right. But why necessarily is the royalty right a property interest? Interest as opposed to a contract interest. I would analogize to the old concept of rents. When we're talking about rents in the sense of a portion of a crop that's grown on land, those rents are considered a real property interest. Hunting rights, I can't pronounce. I never could pronounce the French. Or whatever it is. Those are considered a real property interest. And a mineral royalty is the same thing. Because what you're giving somebody is you're giving them a percentage that is tied to and measured by what comes out of a particular piece of land. And so the minerals that may come out of the subject property are one thing. But what is produced out of some other piece of property that somebody might acquire in the future in this 255 square mile area of interest is an entirely different thing. And that can't vest until the property is actually acquired because you don't even know what it attaches to. It's simply a contract obligation on the part of Universal as operator of that first joint venture to convey this royalty interest if they obtain the property under certain circumstances. And so that's why I believe I was starting to say earlier, if you carefully analyze the Commerce Bank case, Denny v. Thiel and Wadle, I believe this Court will come to the same conclusion that the Wadle Court did. And that is that Commerce Bank misunderstood Denny v. Thiel. They seized on some dicta in Denny v. Thiel and rode with that. And it simply does not stand up that you can have a royalty interest vest in some property in this huge... Well, whether or not they misunderstood it, they came to that conclusion. I once had a professor of English legal history, Professor Milsom, who said that progress in the common law, and I think he was paraphrasing Holmes, is made by abuse of prior precedent. So maybe they misunderstood it. Maybe they understood it perfectly and misdescribed it. That happens. And this case provides this Court with a great opportunity to harmonize the common law. Intermediate state courts that don't even live in our circuit. Yeah, exactly. If we get back to the purpose of the rule against perpetuities, how is the purpose of it served here? I mean, there are not restraints on alienation of land here. It's quite the opposite. It doesn't in the classical sense, Your Honor, of the testator that's trying to tie up land for many, many generations. But what it also, there's another policy interest in not feathering land, like the subject land, with these contingent interests that may or may not come into play for a long, long time. There's a public policy interest in not creating situations where somebody can pop up 30 years later, as Bullion did in this case, and say, you owe us money on these lands. So why not? I mean, that happens all the time when somebody gets a title opinion for the lands. They go back to the patent, and they check all the interests, and they decide who's owed the royalty, and they've got to figure these things out. And it seems to me it complicates matters. If you have to say, well, no, no, now we have to look at the rule against perpetuities, and this clause back 40 years is void ab initio, the fact we've been paying royalty on it, we were wrong. I mean, to me, it seems to complicate matters. I could be wrong. When you search the titles in cases that you're referring to, those interests are recorded. You look to the ñ whether it's the grant or grantee index or the tract index, you can see exactly what's there and what applies. Yeah, but your argument about encumbering the property itself isn't quite right. The property is not encumbered from the outset because if Joe Smith comes in and buys it, Joe Smith has absolutely no obligation under the contract. It's a contractual obligation that Universal has if it acquires the property, and that then binds or attaches to the property only when Universal buys it. Until it does, that property sits out there and can be bought in fee simple by anybody except Universal. But under Bullion's theory of this case, anybody who owns that property, the subject property for any period of time, it becomes like the Uncle Raymond's fable, the tar baby that has stuck to them. So if ñ No, no. That's just what I'm saying. It's not right. If I may finish, Your Honor. Go ahead. If Barrick were to buy some property in the area of interest and not develop it and then sell it to somebody else, how would that party know in buying the property from Barrick that it's not encumbered by this royalty interest that it had attached simply by virtue of the fact that Barrick had owned the subject property for a very short time? But that attaches only upon the purchase by the successor in interest to Universal. Until that happens, the property is not encumbered in the least. But I'm ñ but my example is ñ Now, you're taking this up further, but under that theory, you'd still have to look to the 1979 agreement and decide. I mean, the title examiner would have to decide whether or not that was still binding. But to use their example of the ñ because they're saying this applies to Newmont as well. Say Newmont turns around tomorrow and sells the Deep Star and Deep Post mines. How is the buyer from Newmont to know that those two mines are encumbered by the 1979 agreement that is recorded in the title chain for the subject property but is certainly not recorded in any of the title chain for the Deep Star or Deep Post mines? And so that, I would submit to Your Honors, is a very strong reason why ñ policy reason why the rule of perpetuities should forbid these types of ñ of provisions. The ñ a couple of other interesting points that were made. The ñ in Mr. Belastegui's argument in the previous case, he said that the rule ñ the paragraph 11 area of interest clause applies to any owner or operator of the Leeville mine. And then when Mr. Bruce argued, he says it applies to whoever owns the Leeville mine. They base that on the ñ they base the argument that my client is obligated by a very loose reading of the option agreement by which my client's predecessor, High Desert, obtained the ñ well, optioned the mine back in 1990. If you read that carefully, you will see that the option agreement says that High Desert agreed to assume all of the obligations of the Bullion Monarch joint venture, which was a joint venture consisting of seven or eight parties. They want to read that option agreement as if it said, High Desert agrees to assume all of the obligations as universal, one of the original parties under the 1979 agreement. And it simply doesn't say that. And so their estoppel argument doesn't apply, because there was no statement by High Desert that they would assume these obligations. It's not part of this record in this case. Well, it shouldn't be part of the record in this case. They've made it apart. But if you look at all of the transactional documents leading up to the 1990 purchase by High Desert, you will see that nobody in the chain of title ever assumed, affirmatively assumed the obligations of universal as the operator of that first joint venture. In 1984, a new joint venture took over the subject property, the Leeville Mine, with a new operator, which was a successor in interest to the Polar Group. And in 1986, that was superseded by yet another joint venture. So the way they want to simplify this and say that it was assumed by my client simply is not supported by the record. The other thing that they were suggesting in response to Judge Fletcher's question is about the return of the mine. They don't get the mine back. If you look at the 1979 agreement, it says Bullion owns a purported royalty interest. If you look at the agreement itself, you'll see that Polar was 100 percent owner of most of the properties and 77 percent owner of the others. They don't get this mine back. And that's why Judge Reed wisely said that. But if you unwind it, it may have other consequences. Yeah. You can't unwind something when you have the- No, no. They may be able to buy property in the area of interest. They were never prohibited by my client from buying property in the area of interest. And the evidence, the only evidence in the record is they never had any opportunities to buy any property in the area of interest. And so that's simply a red herring. The other thing that's interesting is in Mr. Belastegui's argument in the prior case, he said that Newmont is responsible, is on the hook since 1991. In 1991, they got a 60 percent ownership in it, but they're also trying to hold my client responsible for properties that my client or his predecessor purchased in the area of interest from 91 to 99. So you can see this really is a tar baby, that it sticks under their theory, it sticks to whoever touches that property forever. Well, that's the point of an area of interest agreement. It's supposed to- Well, but you can't get rid of it. You can't sell it. So if Barrick, even though Barrick doesn't, hasn't owned that mine for 10 years, if they go out now and obtain property in the area of interest, it's Bullion's theory that they're entitled to a royalty on that as well. And I don't believe that you can read that area of interest clause in that, to support that kind of interpretation. But that's where their interpretation naturally takes them and demonstrates, I believe, the fatal flaws in their argument. And for those reasons, Your Honor, we would urge this Court respectfully to uphold the decision of the district court below. Thank you, counsel. Your Honors, there is not a loose reading of the option agreement. The option agreement specifically says that HD is going to take on the responsibilities of the 1979 agreement. An opposing counsel raised this. This was an issue that he wanted redacted from the briefs, but since he raised it, I'm going to address it. We've obtained many documents that were formerly privileged or claimed to be privileged in discovery in this case. And some of those documents related to negotiations going back and forth between High Desert and the Bullion-Monarch joint venture, we call it Westmont in the briefs, when High Desert took over the property. And there are letters going back and forth where High Desert is trying to say, we don't want to take on the 1979 agreement. So basically, if you get past the perpetuity problems, is there other issues in the case? Well, there are other issues. And I'm just trying to clarify that, that they came back and they were told, you have to take that on, and they took it on. So High Desert takes it on two ways. Number one, under the 1979 agreement, because they're the owner of the Leeville mine, but also they specifically agree to take it on. There's another misnomer that I think Barrick is trying to capitalize on, and that's the notion that there is a vesting of a royalty interest on the area of interest properties. And that is not what we're saying the 1979 agreement says. This goes back to my very first point. There are not two royalty interests. There's a vesting of a royalty interest on the Leeville mine. That royalty interest is partially a property right, but it is also, as the court has pointed out, a contractual right. And it's a contractual right that Bullion has on the area of interest properties. It's a contractual obligation that's held by the owner of the Leeville mine. When Universal signed the contract, they took it on. Anybody who steps into Universal's shoes as the owner of the Leeville mine takes on automatically that contractual right. And that's why it's not something that is going to bind these other properties. The court has already pointed out that until an operator of the Leeville mine goes out and buys or acquires one of the properties in the area of interest, anybody can buy it. Fee simple, there's no problem. But is it your position that after it's acquired, let's say, that the operator acquires property in the area of interest and immediately transfers it, then the royalty interest obligation also transfers? No. The royalty obligation stays with the person who acquired it while they owned the Leeville mine. Now, they can have the same rights. So your position is if they acquire it while they own the Leeville mine and they develop it, your old royalties, if they sell it to you or not? Correct. Correct. And if they sell it to another party, that party doesn't become bound by it. These are commercial transactions. All of these are. When you go to buy the Leeville mine, you can decide, do I want to take on this royalty burden in the 1979 agreement that if I acquire anything in the area of interest, I'm going to have to pay Bullion a 1 percent royalty? Yes or no. Barrick and Newmont decided yes, and they made billions of dollars off of that decision. And now they're coming in and saying, we're going to say the rule against perpetuities prevents us from having to pay Bullion. We're saying in addition to making that decision, anybody who comes in and buys that also knows that they are going to go back to the ability to acquire property in the area of interest without having competition from the former members of the 1979 agreement. And granted, that was a more important interest back in 1979 than it is today because of the success that the two big boys out there have had. But that's part of the consideration of clearing out the area of interest back in 1979. Part of that consideration is you're going to have to pay Bullion a 1 percent royalty on anything you acquire outside the area of interest. It's not that you can go buy the property, and once you buy it, there's a new royalty that attaches to that property in the area of interest, or you otherwise acquire it, lease it, however, and somebody coming down the road would have to pay the royalty. But even then, I don't think it would violate the rule against perpetuities because then it would be a matter of record. There would be a royalty attached to it, and whoever sees it would go to buy it and say, okay, I have to make a decision here. Do I want to pay 1 percent to Bullion or not? Do I buy the property or not? There's not the fundamental problem that the rule against perpetuities tries to address that you cannot transfer that because it's tied up somehow. Those properties are not tied up, and that's why Barrick and Newmont are trying to fit a square peg into a round hole. It just doesn't have the same problem that properties will be tied up. In fact, we make the argument that having perpetual royalties for area of interest actually helped to alienate the land, make it more alienable because it gives both parties protection. It gives Bullion protection that it's not going to be hoodwinked into missing something in the area of interest because it's going to be protected, it's going to get 1 percent. But it also helps the person who acquires the Leeville mine because it takes almost all of these royalty agreements require that the seller of the subject property has to leave. And it gives that acquiring party the protection that they're not going to have the person they just bought the property from step over right across the line and say, okay, I'm locating right here and I'm going to start mining right here. And that seems to have worked over the years. And I'll finish with this quote that is in our brief, but I think it really hits the nail on the head. In over a score of cases considering perpetual nonparticipating royalty interests, only three give any indication that the rule against perpetuities is applicable. All others assume without discussion the validity of a perpetual royalty. In some states, notably Texas and Oklahoma, it appears to be too late in the day for the courts to strike down this interest. Too many people have spent too much money in reliance on decisions treating perpetual royalties as perfectly valid. And I think that applies in this case, too. There are too many of these agreements out there to start striking them down as violating the rule against perpetuities. Number one, for the practical effect. Number two, I just don't think the rule against perpetuities applies for the vesting issue. And then secondarily, because there is no harm that the rule against perpetuities is trying to prevent by having a royalty area of interest. Thank you, counsel. The case just argued will be submitted. I want to thank all of you for your very good arguments and presentations. It's an interesting question. And we will be in recess. All rise.
judges: Thomas, McKeown, Fletcher